UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

EDUARDO CAMACHO,

                              Petitioner,

          v.

E. K. McDANIEL, *et al.,*

                              Respondents.

Case No. 3:11-cv-00318-MMD-WGC

ORDER

## I.    INTRODUCTION

This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the remaining claims. Petitioner Eduardo Camacho seeks to set aside his Nevada state conviction, pursuant to a jury verdict, of first-degree murder with the use of a deadly weapon, attempted robbery with the use of a deadly weapon, burglary with the use of a deadly weapon, battery with the use of a deadly weapon causing substantial bodily harm, and battery with the use of a deadly weapon.  He was sentenced on the charge of first-degree murder with the use of a deadly weapon, pursuant to a penalty-phase jury verdict, to consecutive sentences of life with eligibility for consideration for parole after 20 years served on each sentence.  He was sentenced on the remaining charges to sundry term sentences running either concurrently with the sentence on the count charging first-degree murder with the use of a deadly weapon or consecutively to the sentences on the other counts. (*See* ECF No. 47-15.)

///

Camacho challenged his conviction on both direct appeal and state post-conviction review.

## II.    FACTUAL BACKGROUND

The state court record and trial evidence tended to establish, *inter alia*, the following, which serves as general backdrop for the discussion of the specific claims herein.[1]

On November 8, 2005, Paul Lowe and brothers Billy and Bobby Wood shared a two-bedroom apartment. Bobby Wood's friend Brian Snapp also was staying at the apartment temporarily so that he figuratively could get back on his feet. However, he had stayed longer than was originally contemplated, and the three roommates had decided that Snapp must move out. After having already given him the prior week to move out, Bobby Wood told Snapp that afternoon that he would have to move out immediately. Wood told his friend that he would go with him later to look for a motel, however. (ECF No. 45-2 at 63–72; ECF No. 46 at 40–49, 83–84, 93–95, 99–100, 114–15.)[2]

After 8:00 p.m. that evening, the Wood brothers and a female neighbor Alexi Capsoff got into a heated argument and physical altercation with Snapp after, *inter alia*, Snapp grabbed and touched Capsoff inappropriately. The altercation carried on outside the apartment, involving also another neighbor Megan Borbo; and it was heated enough apparently to prompt other neighbors to call the police. Before the police arrived, the

///

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering Petitioner's claims.

[2]Billy Wood's recollection instead was that the roommates had not yet told Snapp that he must move out and that Billy Wood was the one that was going to tell him that day. (ECF No. 45-2 at 71–72, 133–34; ECF No. 45-3 at 6.) Snapp had been brother Bobby Wood's friend before Snapp moved in temporarily. (ECF No. 45-2 at 67–68; ECF No. 46 at 42–44.)

brothers ultimately told Snapp to leave and not come back. Snapp – who was by himself without his later codefendants, including Camacho, being present – then said as he was leaving that he was going to come back and kill them all. (ECF No. 45-2 at 73–78, 124–25, 131, 140; ECF No. 45-3 at 3, 6–10, 16; ECF No. 46 at 9–19, 28–32, 37–38, 50–57, 84–87, 95–98, 102–04, 109–13.)

Crysta Oliver had been dating Carlos Ruiz for about six months, and she had known his friend Brian Snapp for almost as long. Oliver, Ruiz, Alex Marquez, and Marquez' sister then were living in a three-bedroom apartment. Others, such as Eduardo "Chongo" Camacho, sometimes also would stay at the apartment for a night or for several days at a time. (ECF No. 46 at 132–43, 174, 177.)

On the evening of November 8, 2005, Snapp arrived at their apartment in a highly agitated state. In statements admitted apparently as excited utterances, he stated that he had been in a fight with the Wood brothers at their apartment and that his two best friends had turned on him. Snapp initially tried to persuade Ruiz to go back to the other apartment "to do something about the situation," "to get his stuff," and "to get them back, to go back and . . . fight with them basically." Ruiz was reluctant to do so, and he tried to calm Snapp down. Snapp would not drop the matter, and he continued to try to enlist Ruiz' aid, at the very least to drive him back over to the other apartment. Ruiz continued to resist, and he suggested that Snapp ask the others in the apartment to help him. (*Id.* at 143–54, 172–76, 181–86.)[3]

Camacho, Marquez, and Marquez' sister were in the apartment at that time. Crysta Oliver did not see specifically who Snapp was talking to, but she heard male voices and she saw from down the hall that Snapp was speaking to others in the living room.

---

[3]Snapp's statements seeking to enlist the aid of Ruiz and others in the apartment appear to have been admitted as statements during the course and in furtherance of a conspiracy pursuant to NRS § 51.035(3)(e). *See generally Burnside v. State,* 352 P.3d 627, 642 (Nev. 2015) (statements made by a coconspirator are in furtherance of the conspiracy if they are designed to induce another person to join the conspiracy or act in a way that would assist the conspiracy's objectives). The statements testified to by Oliver that are referenced in the text do not form the factual predicate for any claim that both was exhausted in the state courts and is presented in the pleadings in this action.

Oliver heard Snapp talking about going to get something over at the other apartment, and he referred to a safe with marijuana in it. Ruiz thereafter agreed to drive Snapp and others over to the other apartment. Oliver saw Ruiz and Snapp walk out of their bedroom. She further testified that "I did not see who walked out the front door, everybody walk out the front door." (*Id.* at 153–57, 174–75, 183–90.)

Portions of the later codefendants' respective interviews with detectives were introduced at trial, along with instructions limiting the jury's consideration of each codefendant's statement against only that codefendant.[4] In his statements introduced at trial, Camacho admitted that he was involved in the later attack at the other apartment, that he was armed with a wooden baseball bat when he entered the apartment, that the bat fractured into multiple pieces while he was using it during the attack, and that his intent in entering the apartment was "the taking of money that did not belong to him" and "going to get someone else's property." (ECF No. 46 at 241–47, 256–60.)

Bobby Wood kept a small portable safe in his bedroom closet, which was where they also kept the mattress that Snapp had been sleeping on.  Snapp knew that Wood recently had received an accident settlement. (*Id.* at 49–50, 79–83, 101–06.)

At some point after 9:00 p.m., only Paul Lowe and Billy Wood were inside their apartment. Bobby Wood was in Borbo's neighboring upstairs apartment checking on her following the earlier altercation and visiting with her, Capsoff, and sundry other neighbors and friends. (ECF No. 45-2 at 78–79; ECF No. 46 at 19–20, 57–58, 87–88, 106–07.)

Billy Wood heard a knock on the door in their downstairs apartment. As he was turning the knob to answer the door, Snapp kicked the door open and rushed into the apartment with Camacho and Alex Marquez. Snapp was armed with a claw hammer and Camacho and Marquez each were armed with a baseball bat. (ECF No. 45-2 at 79–85 & 136–37; ECF No. 45-3 at 10–11, 16–17.)

///

///

---

[4]The Court discusses Camacho's claim that codefendant statements to detectives allegedly inculpating him were admitted at trial in its analysis of Ground 1, *infra*.

Snapp, Camacho and Marquez started beating Billy Wood and Paul Lowe with their weapons, hitting Wood repeatedly in the head. Wood testified that the three separately would rotate back and forth from one victim to another. (ECF No. 45-2 at 80–85.)

At a point when only Camacho then was beating him, Billy Wood was able to retreat into a bedroom, close the door, and hold it closed with his foot. He then heard the others trying to beat through the bedroom door. Both before and after he retreated to the bedroom, Wood heard Paul Lowe screaming "why are you killing me?" to Snapp and the others. (*Id.* at 83, 85, 93–94, 135–36; ECF No. 45-3 at 3–4, 14–15.)

Meanwhile, in Borbo's apartment upstairs, Bobby Wood and the others had heard the loud noises coming from downstairs. Fearing that something was wrong, Wood grabbed a baseball bat from behind Borbo's door and went downstairs. (ECF No. 46, at 20–21, 33, 58–59.)

As Bobby Wood came down the stairs trailed by Capsoff, they heard screaming coming from his apartment. Wood, similar to his brother, heard Paul Lowe screaming: "Why are you killing me? Why are you killing me, Brian?" (*Id.* at 20–22, 59, 108–09.)

It took Wood a moment to gain entry because the door was locked. Once inside, he saw Snapp, Marquez and Camacho standing over he believed Paul Lowe, "like, waiting for him to die or something." Wood ran up and swung at Snapp; but he then got hit by Marquez, with whom he then grappled before also being struck by Camacho. He thereafter lost track of who was hitting him as he tried to protect himself from the blows, before ultimately passing out. (*Id.* at 59–71.)

Billy Wood, meanwhile, eventually was able to see into the rest of the apartment through holes that had been knocked into the bedroom door by the attackers. At one point, Wood saw Snapp attacking his brother with a hammer and further that only Camacho was at the bedroom door. He ran out of the bedroom and engaged Camacho and then Marquez with a weightlifting bar, leading to each one fleeing out the front door. Wood then came up behind Snapp, grabbed the hammer from him, and then also chased

him out of the apartment. (ECF No. 45-2 at 85–89, 95–98, 100–01, 113–16, 129–30, 133, 138–40; ECF No. 45-3 at 17, 20–23.)[5]

The brothers did not hear the attackers say anything either to each other or to the victims, including making any demands for money, the portable safe, or the key to the safe. Nothing was taken during the attack before the three assailants each separately fled from Billy Wood's counterattack. (ECF No. 45-2 at 107, 135; ECF No. 45-3 at 17–18; ECF No. 46 at 104–05, 108–09.)

Paul Lowe succumbed to his injuries a short time thereafter. He died from a stab wound to his chest that he received from an approximately eight-inch long butcher knife that had been present in the kitchen prior to the attack. Neither brother saw any of the three attackers wielding a knife during the portions of the attack that they witnessed, while they were trying to fend off blows or counterattack. Billy Woods testified that he also received a stab wound, although he did not know who stabbed him. (ECF No. 45-2 at 88–90, 108–13, 116–19, 126–29, 133, 136–38; ECF No. 45-3 at 5–6, 12–15, 17, 23; ECF No. 46 at 71, 88–89, 97, 125–26; ECF No. 46-1 at 37–40, 92–93, 114–20, 130–31; ECF No. 46-2 at 27–28.)

Investigators recovered a piece of a broken wooden baseball bat with red stains from underneath the refrigerator at the apartment. They recovered the other matching piece from the broken bat from inside the passenger compartment of Snapp's vehicle. Bloodstains matching Paul Lowe's DNA were found on, *inter alia*, the bat piece found in the apartment and on one of Camacho's shoes. (ECF No. 46 at 247–49; ECF No. 46-1 at 12, 36–37, 40–41, 46–47, 53–57, 71–76, 91–97, 108–10; ECF No. 46-2 at 28.) [6]

[5]Previously, while inside the bedroom with his foot against the door, Billy Wood had used the long weightlifting bar to reach over and knock out a window. He thereafter yelled "call the police" and then feigned like they were arriving. (ECF No. 45-2 at 85, 98,100–01, 114–15.)

[6]Given the issues in this action, there is no occasion to summarize additional evidence such as, *inter alia*: (a) forensic evidence inculpating the other defendants, and (b) evidence regarding the severity of injuries to Billy Wood as that related to the charge of battery with the use of a deadly weapon causing substantial bodily harm.

Camacho was charged and tried jointly with Snapp, Marquez and Ruiz. On the murder charge, they were not charged with having committed murder with a willful, deliberate, and premeditated specific intent to kill Paul Lowe. Rather, they were charged with having committed felony murder because the killing occurred during the perpetration or attempted perpetration of a burglary and/or robbery. The attackers were alleged to have only "the intent to commit the crime of battery, larceny and/or robbery" in the residence. (ECF No. 44-3 at 2–3.)

The state began its opening statement with the observation that "this is a case of felony murder." The state did not seek thereafter to argue that Camacho entered the apartment with a specific intent that Lowe be killed or with any knowledge that he would be killed, as opposed to being guilty of felony murder. The sole basis for culpability for first-degree murder set forth in the jury instructions was pursuant to the felony-murder rule, predicated upon the killing having occurred during the perpetration or attempted perpetration of a burglary and/or robbery. (ECF No. 13-2 at 26–28; ECF No. 45-2 at 39, 49–50; ECF No. 47 at 26, 59–63, 123–35; *see also* ECF No. 12-21 at 28.)

## III. STANDARD OF REVIEW

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Id.* at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *Id.* at 181–88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision but arrives at a different result. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Id.* at 16. At bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., id.* at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference to the state court factual finding:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

1    *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

2        Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be

3    correct unless rebutted by clear and convincing evidence.

4    **IV.    DISCUSSION**

5        **A. Ground 1: Alleged *Bruton* Violation**

6        In Ground 1 of the third amended petition, Camacho alleges that he was denied

7    his right to confrontation under the Sixth and Fourteenth Amendments when the trial court

8    permitted the state to introduce statements from non-testifying codefendants allegedly

9    inculpating Camacho. (ECF No. 43 at 17–20.)

10       The Court has summarized general factual and procedural background in the text,

11   *supra* at 1–6. Camacho contends that introduction of the statements set forth below by

12   Brian Snapp to Detective David Jenkins and by Alex Marquez to Detective Ron Chalmers

13   violated his right to confrontation.

14       Camacho relies upon the following testimony by Detective Jenkins introducing

15   statements by Snapp:

16       Q    And what did he [Snapp] ask [on the ride back to Reno from
         Winnemucca about the details of the investigation]?

17
         A    Well, he asked me who had passed away and I don't remember
18       exactly what word he had used, who had died or who had been killed,
         something along those lines.
19
         Q    Did you tell him?
20
         A    Yes, I told him Mr. Paul Lowe.
21
         Q    And did Mr. Snapp acknowledge that he knew Paul Lowe?
22
         A    He did, and he went on to explain that he was one of three different
23       roommates that had been residing with in [sic] the apartment where this had
         occurred.
24
                                   . . .
25       Q    . . . .    First of all, during that conversation did Brian Snapp at any
         point acknowledge that he had been involved in the attack that had occurred
26       at Meadowood apartments?

27       A    He did.

         Q    And did he make any statements with regard to whether he was
28       armed or not at that time?

9

A       Yes.

*Q*      What did he tell you as far as whether he was armed?

A       He initially told me that he couldn't remember exactly what he, personally, had taken and he thought perhaps it was a stick or a club, but he didn't have a specific recollection of what the item had been, only that he had taken something.

(ECF No. 46 at 281–82; *see also id.* at 277–80.)

Camacho further relies upon the following testimony by Detective Chalmers introducing statements by Marquez:

Q       And did he [Marquez] admit that he was present at the Meadowood Mall apartments the previous evening?

A       Yes.

Q       Did he admit to being aware that there was a [sic] attack that had occurred at an apartment, at the Meadowood Mall apartments?

A       Yes.

Q       Did he admit to having entered the apartment?

A       Yes.

. . . . .

Q       And was – what was his response as to whether he was armed or not?

A       He told me that he was armed with a baseball bat.

. . . . .

Q       And in substance, what did he tell you as to why he entered the apartment?

A       There were a couple of reasons, one of which included obtaining money from a safe that did not belong to him.

(*Id.* at 237–38, 240.)

Prior to these statements by Snapp and Marquez being introduced – and at multiple other points during the trial – the trial judge instructed the jurors that they could consider statements made by a particular defendant only as to that defendant and not as to any of the other defendants. (*See, e.g., id.* at 162, 163–64, 194, 236, 241, 261, 280-–81; ECF No. 46-1 at 22.)

The closing jury instructions thereafter reinforced the prior instructions:

During the trial the court has instructed you that certain statements attributed to a particular defendant pertain only to such defendant. You

must strictly follow this instruction. During your deliberations you may not consider or discuss any statement in your consideration of the evidence as to any other defendant.

(ECF No. 13-2 at 18.)

On direct appeal, the state supreme court rejected Camacho's confrontation claim:

Camacho contends that the district court violated his constitutional right to confront his accusers by admitting the pretrial confessions of two nontestifying codefendants during the joint trial. Camacho specifically claims that (1) the codefendants' unsworn confessions implicated him and corroborated his own extrajudicial confession to the police, (2) the district court's limiting instructions to the jury did not overcome the resulting prejudice, and (3) the confessions were testimonial in nature. Camacho argues that the unconstitutional admission of the codefendants' confessions rendered his verdict unreliable and therefore his conviction must be reversed.

The Confrontation Clause of the Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[FN1] In Bruton v. United States, the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession facially or expressly implicates him as a participant in a crime and is introduced at their joint trial, even if the jury is instructed to consider the statement only in relation to the codefendant.[FN2] In Richardson v. Marsh, the Court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."[FN3] In Crawford v. Washington, the Court held that extrajudicial testimonial statements by a witness that are offered against a defendant are barred under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.[FN4]

[FN1] U.S. Const. amend. VI.

[FN2] 391 U.S. 123, 126 (1968); see also Cruz v. New York, 481 U.S. 186, 193 (1987) (holding "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him" (internal citation omitted)).

[FN3] 481 U.S. 200, 211 (1987).

[FN4] 541 U.S. 36, 68 (2004).

Here, the State presented the testimony of the police detectives who interviewed two of Camacho's codefendants: Alex Marquez and Brian Snapp. The district court instructed the jury that it could consider the statements attributed to a particular defendant only as they pertain to that defendant and not as they pertain to any of the other defendants. The statements attributed to Marquez and Snapp did not mention Camacho by name, make any reference to his existence, or otherwise implicate him as a participant in the alleged crimes. Under these circumstances, we conclude that admission of Marquez's and Snapp's extrajudicial confessions did not violate Camacho's Sixth Amendment confrontation rights.

(ECF No. 47-13 at 2–4.)

The state supreme court's rejection of Camacho's confrontation claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The admission in a joint trial of a codefendant's out-of-court statement that inculpates the defendant violates the defendant's right of cross-examination guaranteed by the Sixth Amendment's Confrontation Clause. *Bruton,* 391 U.S. at 126. The admission of such an inculpatory statement constitutes prejudicial error even if the jury is instructed that the codefendant's statement can be used against only the codefendant and cannot be used against the defendant. *Id.* at 135–37. However, if the codefendants' statements do *not* inculpate the defendant, then such a limiting instruction is fully adequate to protect the defendant's confrontation rights. *Richardson* 481 U.S. at 211.

No *Bruton* violation occurred in this case. As the state supreme court observed, with full support in the underlying record, "[t]he statements attributed to Marquez and Snapp did not mention Camacho by name, make any reference to his existence, or otherwise implicate him as a participant in the alleged crimes." (ECF No. 47-13 at 4.) The Marquez and Snapp statements did not inculpate Camacho, and his *Bruton* claim therefore does not even make it out of the starting gate.

Camacho nonetheless urges that "[i]n other words, all three statements [including Camacho's own statement] acknowledged that Camacho, Snapp and Marquez went to the Meadowood apartments to unlawfully take money from a safe, and that all three men brought and used weapons in the altercation." (ECF No. 43 at 20.) Clearly, however, a

*Bruton* claim is decided based not upon "other words" but instead upon the *words actually used in the record at trial.* Neither Marquez nor Snapp implicated Camacho in the statements admitted at trial, and each spoke only to what they each respectively did. Even more clearly, Camacho's *own statements* cannot be added to the mix to bootstrap a nonexistent issue into a *Bruton* violation. Camacho's own voluntary statements undeniably were admissible against him under the Constitution. Neither Marquez nor Snapp implicated Camacho, and Camacho implicated himself. That scenario presents no constitutional issue.[7]

Camacho further urges that Supreme Court precedent establishes that the trial court's limiting instructions were without effect in this case. (ECF No. 61 at 13–15.) Camacho is wrong under well-established law. A limiting instruction is ineffectual under the law if the codefendants' statements inculpated the defendant. *Bruton supra*. The limiting instruction is fully effectual, however, where the codefendants' statements do not inculpate the defendant. *Richardson supra*. Again, the statements by Marquez and Snapp admitted at trial did not inculpate Camacho. The multiple limiting instructions given therefore were fully effectual under well-settled Supreme Court precedent.[8]

---

[7]Camacho argues that the other statements inculpated him because "the detectives' testimony with regard to the factual admissions made by Marquez and Snapp were not only testified to in the same order, but their purported admissions were also 'in all essential respects' identical to the factual admissions made by Camacho." (ECF No. 61 at 19–20). Per their statements, each codefendant separately admitted that he engaged in what was the same criminal episode for what was substantially the same reason. The mere fact that each codefendant admitted, separately, to his own individual participation in the attack, and for substantially the same reason, did not render each statement inculpatory of the other codefendants. Under Camacho's argument, all parallel codefendant statements regarding joint crimes would be barred. That is not the law.

[8]Camacho argues that the state's repeated references in its opening statement and closing arguments to Camacho's joint participation in the attack with his codefendants undermined the presumption that the jury followed the instructions. (ECF No. 61 at 14–15.) Snapp, Marquez and Camacho each separately admitted their own involvement. Eyewitnesses testified that Snapp, Marquez and Camacho – jointly -- participated in the attack. Nothing – absolutely nothing – in *Bruton* or following caselaw prevented the state from pointing to the overwhelming evidence of a joint attack. All that *Bruton* precluded was the admission of codefendant statements inculpating other defendants, and that rule was fully complied with. Camacho's argument is meritless.

The state supreme court's rejection of Camacho's legally and factually unsupported *Bruton* claim therefore clearly withstands review under AEDPA's deferential standard of review. The claim would be wholly without merit even on a *de novo* review.

Ground 1 does not provide a basis for federal habeas relief.[9]

### B. Ground 2(a): Effective Assistance of Counsel – Decision Not to Testify

In Ground 2(a), Camacho alleges that he was denied his right to effective assistance of counsel under the Sixth and Fourteenth Amendments. He alleges that his codefendant Snapp sought to intimidate the other defendants from testifying when the defendants each were conferring with their respective counsel in the courtroom on a break. He further alleges, in the pleading, that trial counsel in some unspecified fashion "did not allow him to testify," although he alleges specifically only that he did not testify because of Snapp's intimidation. He alleges in the third amended petition that if he had been allowed to testify, he would have testified that: "(1) he had no idea of Snapp's ulterior motive to harm or hurt anyone in the apartment; and (2) . . . if he had known that Snapp had an ulterior motive, he would not have accompanied Snapp to pick up Snapp's personal property from the apartment." (ECF No. 43 at 20–24.)

Toward the end of the state's case in chief, the trial court advised the defendants that they each had a right to testify. The court stated, *inter alia*: "The decision as to whether or not to testify is yours alone to make and you should each consider that carefully after discussing it with or receiving the advice of your counsel." The trial judge asked Camacho whether he understood what he had said, and Camacho responded: "Yes, sir." (ECF No. 46-1 at 122–23.)

The next morning, defense counsel brought to the court's attention an incident that had occurred after both the court and the jury had retired from the courtroom for the day.

///

///

---

[9] *Accord Carlos Ruiz v. Renee Baker*, No. 3:11-cv-00844-RCJ-WGC, ECF No. 31, at 17–18 (D. Nev., March 25, 2015), *certificate of appealability denied*, No. 16-17087 (9th Cir., March 8, 2017) (rejecting codefendant Ruiz' *Bruton* claim).

The incident occurred while some counsel were discussing with their respective clients the possibility of testifying. (ECF No. 46-2 at 4–5.)

A deputy sheriff reported the following to the court:

> DEPUTY MUELLER: . . . And after the attorneys were briefing with their clients regarding the possibility of them testifying for today on their own behalf, there was some discussion between the defendants. Mr. Snapp mentioned something to the effect of, "If one of us testifies, we all go down." Then Mr. Ruiz voiced his displeasure to the effect of, "Don't you think you have dragged us in this far enough," something similar along those lines. Then they started going back and forth about respect issues and – I guess that's about it, just some bickering going on. And at that point, I notified my team leader that we had a problem with our group and that we'd rearrange our transport arrangements with them walking together as a group.
>
> MR. SEXTON [counsel for Marquez]: Could I ask – Deputy, did you perceive that as an attempt by Mr. Snapp to intimidate the other defendants in regards to testifying?
>
> DEPUTY MUELLER: I could see that, yes.

(*Id.* at 5–6.)

Camacho's counsel stated to the court:

> MR. VAN RY: Your Honor, I came in right before the interchange between Mr. Ruiz and Mr. Snapp, and in my opinion, there was definitely some intimidation going on through body language from Mr. Snapp and there were some questions of who's respecting who going on between each other with the bickering, and I don't remember the exact words that Mr. Snapp said, but whatever he said, I took it to mean that ultimately when they get down to wherever they're going to go, if someone testifies, someone is gonna get their respect, meaning something else later. And that's basically what I heard.

(*Id.* at 7.)

The court stated to the defendants, *inter alia*:

> As I advised you yesterday, the decision as to whether or not to testify is yours alone to make. It's not a decision made by your lawyer or by anybody else, but you should make that decision after conferring carefully and thoroughly and with your counsel.
>
> . . .
>
> Your decision as to whether or not to testify and your cooperation with your counsel during this trial are among the most important decisions each of you will ever make in your life. Under no circumstances should the

decision you make concerning whether or not to testify be influenced in any way by the conduct or statements of any other defendant or any other person, except your counsel and your own conscience and decision in the case. If the Court is advised of any further improper communication on the part of any defendant in this trial, that person will be removed from the courtroom for the remainder of the trial.

(*Id.* at 8–9.)

The court once again asked the defendants whether they understood, to which Camacho responded: "Yes, sir." (*Id.* at 9.)

The court further instructed the defendants to advise their counsel at once if they were aware of any improper conduct on the part of any defendant or person during the trial. (*Id.*)

The record does not reflect that the court was informed of any further incidents.

Thereafter, after the state, Snapp, and Marquez had rested, Camacho's counsel stated on the record:

MR. VAN RY: Likewise, your Honor, based on my advice and our discussions, my client is not going to present any witnesses and/or testify on his own behalf.

(*Id.* at 68.)

When Camacho's counsel rested his defense explicitly without calling him as a witness, Camacho remained silent on the record. He did not state to the trial court that his counsel was incorrect and that he instead wanted to testify. (*Id.*)

In his *pro se* state post-conviction petition, Camacho alleged both a claim of trial court error and a claim of ineffective assistance of trial counsel related to the incident. Camacho alleged that the trial court violated his right to testify after he allegedly was intimidated by Snapp. Camacho further alleged that he was denied effective assistance of counsel when trial counsel "advise[d] Camacho not to testify on his own behalf due to hearing and witnessing Brian Snapp threaten Camacho that if he would testify against him . . . he would seek retribution when they got to prison." (ECF No. 47-16 at 34.) Camacho alleged that he would have testified "that he had no idea of Brian Snapp's ulterior motive to harm or murder anyone at the Woods apartment, and had he known, he

would have never agreed to accompany him to pick up his personal property." (ECF No. 45-16 at 17, 34–35, 36.)

Counsel appointed thereafter filed a supplement to the petition that expressly adopted the above-described *pro se* claim of ineffective assistance of trial counsel. (ECF No. 48-3 at 6.)

The state district court heard oral argument on the petition without holding an evidentiary hearing. The court and counsel discussed a variety of potentially related claims of trial court error and ineffective assistance of trial and appellate counsel. However, the discussion arguably did not speak directly to the claim of ineffective assistance of trial counsel that instead was alleged in the pleadings. (*See* ECF No. 48-12 at 4, 8–9, 13–15, 18–21.)

The district court ruled as follows from the bench after the argument:

> [T]he contention concerning the district court's instruction and admonition of the defendant regarding his constitutional right to testify is denied, the Court finding that the defendant was appropriately and accurately advised of his right to testify and that that was done in the trial at or near the conclusion of the State's case in chief.

(*Id.* at 22–23.)

In the written findings, conclusion and order, the district court rejected a related claim of ineffective assistance of appellate counsel on the basis that "[t]he court informed Camacho of his right to testify and the record does not reveal circumstances that would give rise to some additional duty by the court." The court held that the claim therefore was not likely to lead to relief had it been raised on direct appeal. (ECF No. 48-13 at 4.)

On the post-conviction appeal, different appointed counsel argued, *inter alia*, the following claim:

**D.    Mr. Camacho Was The Victim of Ineffective Assistance of Counsel Because His Trial Counsel Failed to Let Him Testify On His Own Behalf.**

> During the trial, Mr. Camacho informed his attorney that he wished to testify in his own defense. If Mr. Camacho had been allowed to testify he would have shown (1) that Mr. Snapp had threatened that if he testified against him, Mr. Snapp would seek retribution in prison . . ., and (2) that Mr.

> Snapp initiated the crime, mislead his co-defendants about his true intent, and committed the actual murder. There is a reasonable probability that had Mr. Camacho's attorney permitted Mr. Camacho to testify he would not have been convicted on at least the murder charge.

(ECF No. 48-24 at 11.) While Camacho presented claims also of ineffective assistance of appellate counsel in the post-conviction appeal brief, the claims did not pertain to a failure to raise an issue on direct appeal regarding Camacho's right to testify. (*See id.* at 3, 6 & 10-11.)

In its order of affirmance, the state supreme court, *inter alia*, rejected several enumerated claims of ineffective assistance of appellate counsel. The court rejected the claims on the basis that "review is impossible when, as here, an appellant fails to provide an adequate record" and the court accordingly could not conclude that the district court erred in rejecting the claims. (ECF No. 48-26 at 3–4.) The court appended the following footnote to its discussion of the claims:

> Similarly, we reject Camacho's contention that trial counsel was ineffective for failing to permit him to testify on his own behalf and his related claim that appellate counsel was ineffective for failing to raise this issue.

(*Id.* at 4.)

The state supreme court's rejection of the claim of ineffective assistance of trial counsel presented to that court was neither contrary to nor an objectively unreasonable application of clearly established federal law.

When, as here, a state court rejects a claim on the merits without articulating particularized reasons for its decision, the deferential standard of review under AEDPA continues to apply:

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L.Ed.2d 938 (2004).
>
> . . .
>
> Under § 2254(d), a habeas court must determine what arguments or theories supported *or, as here, could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could

18

disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court. . .

. . . . .

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Harrington v. Richter*, 562 U.S. 86, 101–02 (2011) (emphasis added); *see also id.* at 98–100.[10]

On an ineffective-assistance claim, a petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, a petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807–08 (9th Cir. 2003).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On the performance prong in particular, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. When the deferential review of counsel's representation under

///

///

---

[10]Camacho implies that AEDPA deference may not apply because he was not personally present at the non-evidentiary hearing where his counsel argued his state post-conviction petition. (*See* ECF No. 61 at 26 & n.5.) Camacho offers no principled argument supported by apposite controlling authority tending to establish that his not being personally present at his counsel's argument of the petition in the state district court precludes AEDPA deferential review of the state supreme court's decision.

*Strickland* is coupled with the deferential standard of review of a state court decision under

AEDPA, such review is "doubly" deferential:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123, 129 S. Ct. at 1420. . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

Moreover, where, as in the present case, there is no state court testimony

reflecting counsel's reasons for a course of action, the strong presumption regarding

counsel's performance continues to apply:

> Although courts may not indulge "*post hoc* rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, *Wiggins, supra*, at 526–527, 123 S.Ct. 2527, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (*per curiam*). . . . . *Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind. 466 U.S., at 688, 104 S.Ct. 2052.

*Id.* at 109–10.

The state supreme court's rejection of the claim presented in Ground 2(a)

withstands review under the foregoing principles.

Under long-established Ninth Circuit precedent, a defendant's silence on the

record when his attorney rests without calling him as a witness waives his right to testify.

That waiver further forecloses a claim of ineffective assistance of counsel based upon

counsel purportedly "not allowing" the defendant to testify. *See, e.g., United States v.

Pino-Noriega*, 189 F.3d 1089, 1094–95 (9th Cir. 1999); *United States v. Joelson*, 7 F.3d

174, 177–78 (9th Cir. 1993); *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993).

Notably, this case law was decided against a backdrop of Ninth Circuit precedent that not

only did not require the trial court to advise the defendant that the decision was his alone

to make but indeed discouraged the court from becoming involved in the decision-making

process. *See, e.g., Pino-Noriega*, 189 F.3d at 1094; *Joelson*, 7 F.3d at 177–78.

Clearly, given this Ninth Circuit precedent, a conclusion by the state supreme court that Camacho waived his right to testify and that this waiver foreclosed his ineffective-assistance claim would not be an objectively unreasonable application of clearly established federal law. This conclusion follows with even greater force in Camacho's case because, in contrast to the scenario typically presented in the Ninth Circuit case law discussed above, the trial court informed Camacho on the record – twice – that the decision as to whether to testify was his alone to make. (*See* text *supra* at 14–16.) On the lower court record[11] and under the law at the time of the state supreme court's April 6, 2011, decision, fair-minded jurists most certainly could conclude that Camacho waived his right to testify and that his ineffective-assistance claim thus was foreclosed.[12]

Moreover, separate and apart from waiver, Camacho cannot establish either deficient performance or resulting prejudice from counsel's advice that he not testify.[13] Camacho cannot establish either *Strickland* requirement for basically the same underlying reason—the testimony that he alleged that he would have given would have been, at

_____

[11] *Pinholster* would appear to establish "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. *See also id.* at 192 n.14 ("Both parties agree that these billing records were before the California Supreme Court."). The Ninth Circuit has held *en banc*, however, that federal habeas review under AEDPA is not limited to the record before the appellate court that decided a claim on the merits but instead extends to all material in the entire state court record on file in the lower court. *See McDaniels v. Kirkland*, 813 F.3d 770, 780–81 (9th Cir. 2015), *on remand*, 839 F.3d 806 (2016), *cert. denied*, 138 S. Ct. 64, 65 (2017). Any failure by Camacho's state post-conviction appeal counsel to provide the state supreme court with an adequate record concerning this claim therefore would not appear to affect this Court's analysis under AEDPA.

[12] Camacho urges that he did not knowingly and intentionally waive his right to testify, that the right cannot be waived by counsel, and that he cannot be compelled to remain silent by his trial counsel. ECF No. 61 at 23. However, the Ninth Circuit case law cited in the text establishes that fair-minded jurists could conclude that Camacho's own silence on the record when his counsel rested without calling him to testify knowingly and intentionally waived his right to testify, foreclosing the ineffective-assistance claim. Camacho cites no authority within his waiver argument compelling a contrary conclusion.

[13] *Cf. Dows v. Wood¸* 211 F.3d 480, 487 (9th Cir. 2000) (analyzing issue also under *Strickland* factors). While the state court record does not contain any testimony by defense counsel stating his reasoning, counsel's statement when he rested the defense case clearly reflects that he advised Camacho to not testify. (*See* text *supra* at 16.)

best, ineffectual. On the prejudice prong specifically, Camacho cannot establish the requisite prejudice in this context by demonstrating only an alleged deprivation of his right to testify. Rather, he instead must demonstrate that there was a reasonable probability of a different outcome at trial had he testified. *See, e.g., Matylinsky v. Budge*, 577 F.3d 1083, 1097–98 (9th Cir. 2009).

Testimony that Camacho was unaware that Snapp intended to harm the victims would have begged the question on the murder charge. The defendants were charged with felony murder, not specific-intent murder. (*See* text *supra* at 7.) Any claimed ignorance of Snapp's intent to harm the victims would not have precluded the murder conviction on the sole theory pursued by the state, felony murder.

Nor was there a reasonable probability of a different verdict on the underlying predicate felonies of burglary and attempted robbery had Camacho self-servingly testified that if he had known of Snapp's ulterior motive he would not have gone with Snapp "to pick up" Snapp's personal property from the apartment. Camacho admitted to the police that he was armed with a baseball bat when he went to the apartment, that he was involved in the attack, and that his intent in entering the apartment was "the taking of money that did not belong to him" and "going to get someone else's property." (*See* text *supra* at 4.) Eyewitness testimony further tended to establish that (a) the three men immediately pushed their way into the apartment when Billy Wood started to open the door, and (b) then without a word being spoken immediately began viciously attacking Wood and Lowe with the bat and other weapons. One generally does not bring a weapon to just go "pick up" someone's belongings from their old apartment. Nor does one immediately attack the occupants of the old apartment with said weapon if one's intent is just to "pick up" someone's belongings. Under NRS §§ 200.380 and 205.060, a person who enters a structure to retrieve, or "pick up," even their own property by force is guilty of burglary and robbery. *See, e.g., (Orenthal James) Simpson v. State*, No. 53080, 2010 WL 4226452, slip op. at **5–6 (Nev. 2010) (unpublished). Given Camacho's admissions and the testimony at trial, there was no probability that the self-serving testimony alleged

in his state and federal pleadings would have led to a different verdict at trial on the predicate felonies underlying his felony murder conviction.

Defense counsel therefore did not proceed unreasonably in advising Camacho to not take the stand—with all the concomitant risks attending exposing the then nineteen-year-old[14] to cross-examination by an experienced prosecutor in a murder case—to present such ineffectual testimony. Moreover, sound trial strategy further counseled against potentially impairing the credibility of the defense by presenting such weak testimony in the guilt phase should the case thereafter reach the penalty phase. Nor, again, was there a reasonable probability that the testimony would have changed the outcome during the guilt phase.[15]

Thus, the record in this matter does not support Camacho's allegation in the third amended petition that "trial counsel had no reason not to have Camacho testify at his own trial." (ECF No. 43 at 23.) Advising Camacho to not testify would have been sound

///

---

[14]Given Camacho's birthdate in 1987, he was 19 years old at the time of the October 2006 trial. (*Compare* ECF No. 12-10 at 2 *with* ECF No. 46 at 2.)

[15] Camacho alleges in the federal reply that he also would have testified "that he did not intend to rob or assault anyone, that he was told they were going to the apartment to help retrieve Snapp's personal property . . . [and] that Snapp was the one that beat and stabbed Lowe." (ECF No. 61 at 25.) Adding allegations that were not presented to the state courts implicates both exhaustion concerns as well as the rule in *Pinholster* that review of a claim adjudicated on the merits is restricted to the record before the state courts.  Moreover, these allegations were not included in the third amended petition. A petitioner may not raise claims or material factual allegations for the first time in the reply that were not alleged in the petition. *E.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). In all events, the additional described testimony does not lead to a different outcome. Self-serving testimony that Camacho did not intend to rob or assault anyone would have been belied by (a) his own statements that he entered the apartment armed with a baseball bat with the intent to take money and get property, and (b) eyewitness testimony that on entering he immediately used that bat to join in the attack on the occupants of the apartment. The ownership of the property that he sought to thereby forcibly obtain is immaterial under Nevada law. *Simpson supra.* There further was ample evidence that all three men beat the victims, including Lowe; and any question as to which one of the three fatally stabbed Lowe was not a material point in the felony murder prosecution. There is not a reasonable probability that the allegations added for the first time in the federal reply would have led to a different outcome at trial.

strategy on the record and allegations presented without regard to whether Snapp improperly attempted to intimidate the other defendants.[16]

The state supreme court's rejection of the ineffective-assistance claim therefore was not an objectively unreasonable application of *Strickland*.

Ground 2(a) therefore does not provide a basis for relief.

### C. Ground 2(b): Effective Assistance of Counsel – Codefendant Intimidation

In Ground 2(b), Camacho alleges that he was denied his right to effective assistance of counsel when trial counsel failed to move to for a mistrial and/or severance after codefendant Snapp allegedly sought to intimidate the other codefendants, including Camacho, to keep them from testifying. (ECF No. 43 at 24–26.)

There is no dispute that: (a) Ground 2(b) is unexhausted; (b) the claim would be procedurally barred in the state courts; and (c) Camacho's sole claimed basis for overcoming the procedural default is pursuant to the rule in *Martinez v. Ryan*, 566 U.S. 1 (2012), which Nevada state courts do not recognize as a basis for overcoming state procedural bars. The Court deferred consideration of whether Camacho can overcome

///

---

[16]In the third amended petition, Camacho alleged that trial counsel failed to allow him to testify. (ECF No. 43 at 21, 23.) In the reply, Camacho alleged instead that counsel failed to protect his right to testify from Snapp's alleged intimidation. (ECF No. 61 at 25-28.) It is subject to question whether such a failure-to-protect claim was pled in Ground 2(a) in the third amended petition. In all events, even if the Court were to assume that (a) the only reason that Camacho did not testify was alleged intimidation by Snapp, rather than following what would have been sound advice by counsel on the record presented, and (b) counsel then failed to take some additional action within his power to effectively protect Camacho from perceived intimidation by a codefendant, Camacho still cannot satisfy *Strickland*'s prejudice prong. There was not a reasonable probability that the testimony that Camacho alleges that he would have given would have led to a different outcome at trial. (*See also* the discussion of Ground 2(b), *infra*.)

Camacho further overstates the record in the reply. Camacho asserts that counsel "was aware of the substantial threats against Camacho's life that were made by co-defendant Snapp, all happening in the presence of the trial court, the attorneys and the sheriff's deputy." (ECF No. 61 at 28.) The incident did not occur in the presence of the trial court, and no one referred to any statement by Snapp in which he expressly threatened Camacho's life. The reports by the deputy and the counsel who were present instead were vague as to what words were spoken during an exchange between Snapp and Ruiz, consisting mainly of their impressions. (*See* text at 15 *supra*.)

the procedural default under *Martinez* until after the filing of an answer and reply addressing also the merits.

The factual background outlined in the discussion of Ground 2(a) also pertains to this claim. (*See* text *supra*, at 14–18.)

To overcome a procedural default of Ground 2(b) under *Martinez*, Camacho must establish that counsel in the state district court post-conviction proceeding failed to raise the claim through ineffective assistance of counsel and that the claim was a substantial claim. *See, e.g. Ayestas v. Davis*, 138 S. Ct. 1080, 1096 (2018) (Sotomayor, J., concurring); *Atwood v. Ryan*, 870 F.3d 1033, 1059 (9th Cir. 2017). A claim of ineffective assistance of trial counsel is "substantial" if the petitioner demonstrates that "the claim has some merit." *E.g., Atwood supra*. The Court's review is *de novo* as to all issues pertaining to Ground 2(b), including both the *Martinez* issue and the merits if reached.

The Court holds that state post-conviction counsel was not ineffective for failing to raise Ground 2(b) because the underlying claim of ineffective assistance of trial counsel is without merit. Camacho can demonstrate neither deficient performance nor resulting prejudice on Ground 2(b) under *Strickland*. The claim therefore also is not "substantial" for purposes of *Martinez*.

On the performance prong, as discussed previously, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. Moreover, counsel's performance must be evaluated from counsel's perspective at the time. *E.g., Atwood*, 870 F.3d at 1055. That retrospective view requires that counsel's actions must be assessed based upon the case law at the time of the trial. *See, e.g., Visciotti v. Martel*, 862 F.3d 749, 770–72 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1546 (2018); *Clark v. Arnold*, 769 F.3d 711, 726–27 (9th Cir. 2014).

Camacho—who has the burden of persuasion on federal habeas review—has not cited any controlling authority directly on point holding at the time of his October 2006 trial that alleged intimidation by a codefendant required either a mistrial or a severance. Camacho relies upon, *inter alia*, state case law stating generally that a severance may be

25

warranted if a joint trial would compromise a specific trial right of a defendant or hinder a defendant's ability to prove his theory of the case. *See, e.g., Chartier v. State*, 191 P.3d 1182, 1185, 1186–87 (Nev. 2008).[17] However, Camacho cites no apposite authority that extends any of the general principles upon which he relies to require either a mistrial or a severance—as opposed to perhaps other action—when it is alleged that a defendant believes that a codefendant would exact retribution if he testifies.

Here, trial counsel did not render deficient performance by failing to raise what would have been a *res nova* issue as to whether a mistrial or severance was required based upon a defendant's fear of reprisal if he testified. Nor can he demonstrate resulting prejudice from counsel's failure to raise such a *res nova* issue, as he can cite no apposite holding by controlling authority from the time of the October 2006 trial establishing a reasonable probability that the defense would have prevailed on a motion for a mistrial and/or to sever on this ground. Moreover, as discussed more fully vis-à-vis Ground 2(a), Camacho further cannot demonstrate a reasonable probability of a different outcome in a retrial or severed trial, as there was not a reasonable probability that his proposed testimony would have resulted in a different verdict. (*See* text *supra* at 21–23.)[18]

Ground 2(b) therefore does not provide a basis for relief.

## V.    CONCLUSION

It is therefore ordered that the petition is denied: (a) on the merits as to Grounds 1 and 2(a); and (b) based on procedural default and in the alternative on the merits as to Ground 2(b).

///

---

[17]Camacho further relies upon federal criminal law authorities pertaining to severance, but he acknowledges that the Ninth Circuit has held that these authorities do not establish a constitutional standard binding on the states. (ECF No. 61 at 35 n.8.)  The authorities accordingly do not establish the relief that counsel would have been able to obtain in Nevada state court at the time of his October 2006 trial.

[18]An alleged impairment of Camacho's ability to freely decide whether to exercise his right to testify would not establish the requisite prejudice on the claim of ineffective assistance of trial counsel. Camacho instead must demonstrate a reasonable probability of a different outcome in the trial proceeding. *Matylinsky supra.*

It is further ordered that a certificate of appealability is denied, as jurists of reason would not find the Court's rejection of the claims herein to be debatable or wrong.

The Clerk of Court is instructed to enter final judgment accordingly and close this case.

DATED THIS 11th day of February 2019.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE